| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| Andrew Bisom - SBN - 137071<br>BISOM LAW GROUP<br>300 Spectrum Center Drive, Ste. 1575<br>Irvine, CA 92618<br>714-643-8900<br>714-643-8901 (Fax)<br>abisom@bisomlaw.com | |
| ☐ *Movant(s) appearing without an attorney*<br>☒ *Attorney for Movant(s)* | |

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION**

| In re:<br><br>RICHARD GILBERT ABRAMSON | CASE NO.: 2:08-bk-28573-BR |
|---|---|
| | CHAPTER: 7 |
| | **DECLARATION THAT NO PARTY REQUESTED A HEARING ON MOTION LBR 9013-1(o)(3)** |
| Debtor(s). | [No Hearing Required] |

1.  I am the ☐ Movant(s) or ☒ attorney for Movant(s) or ☐ employed by attorney for Movant(s).

2.  On (*date*): 3/31/3031___ Movant(s) filed a motion or application (Motion) entitled: Motion To Reopen Bankruptcy Case For Purpose Of Allowing Movants To File An Adversary Action to Deny The Discharge Of Their Claims

3.  A copy of the Motion and notice of motion is attached to this declaration.

4.  On (*date*): 3/31/2021___ Movant(s), served a copy of ☐ the notice of motion or ☒ the Motion and notice of motion on required parties using the method(s) identified on the Proof of Service of the notice of motion.

5.  Pursuant to LBR 9013-1(o), the notice of motion provides that the deadline to file and serve a written response and request for a hearing is 14 days after the date of service of the notice of motion, plus 3 additional days if served by mail, or pursuant to F.R.Civ.P. 5(b)(2)(D) or (F).

6.  More than 27__ days have passed after Movant(s) served the notice of motion.

7.  I checked the docket for this bankruptcy case and/or adversary proceeding, and no response and request for hearing was timely filed.

8.  No response and request for hearing was timely served on Movant(s) via Notice of Electronic Filing, or at the street address, email address, or facsimile number specified in the notice of motion.

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

9.    Based on the foregoing, and pursuant to LBR 9013-1(o), a hearing is not required.

Movant(s) requests that the court grant the motion and enter an order without a hearing.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Date: 4/26/2021

Signature

Andrew S. Bisom
Printed name

---

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

Exhibit "A"

Andrew Bisom - SBN - 137071
BISOM LAW GROUP
300 Spectrum Center Drive, Ste. 1575
Irvine, CA 92618
714-643-8900
714-643-8901 (Fax)
abisom@bisomlaw.com

Attorney for Clement Serafin and
Klementyna Newkirk

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re: | Case No.: 2:08-bk-28573-DS |
| **RICHARD GILBERT ABRAMSON,** | CHAPTER 7 |
| Debtor. | **NOTICE OF MOTION TO REOPEN BANKRUPTCY CASE FOR PURPOSE OF ALLOWING MOVANTS TO FILE AN ADVERSARY ACTION TO DENY THE DISCHARGE OF THEIR CLAIMS** |
| | [No Hearing Required Pursuant to Local Bankruptcy Rule 9013-1(o)] |

**TO ALL PARTIES IN INTEREST AND THEIR ATTORNEYS OF RECORD:**
    **PLEASE TAKE NOTICE** that Clement Serafin and Klementyna Newkirk ("Movants")
have filed their Motion for an Order reopening the bankruptcy case of Richard Gilbert Abramson
("Debtor" or "Abramson") for the purpose of filing an adversary action to revoke the discharge
of their claims.

## I.    STATEMENT OF FACTS

    On November 3, 2008 Abramson filed a voluntary petition for relief pursuant to chapter
13 of title 11 of the United States Code. The case was converted to chapter 7 by order entered on
April 9, 2008. Debtor's chapter 7 case was initially closed on January 3, 2013, was reopened by
the Debtor on August 2, 2013 and closed again on March 16, 2016.

In or around 2004, Serafin became acquainted with Abramson pertaining to an investment in a project with East West Resort Development Corporation ("East West"). Abramson was the president and chairman of East West. Abramson represented to Movants that East West was in the business of arranging special financing for major real estate development projects throughout the world. From each transaction, East West would receive a substantial fee, residual income and equity in the projects. The projects Abramson represented to Movants that East West was involved with included but were not limited to the following:

A.      Beijing Olympic Plaza ("Olympic Plaza"): Abramson represented that the Olympic Plaza was an $850 million project with an anticipated $7.8 million in profit for East West at closing, plus $4-10 million in residual income, and 11.9% equity position in the real estate;

B.      XI Hotel in Hong Kong: Abramson represented that the XI Hotel was a $650 million project. East West would receive an anticipated $9.6 million in profit for East West at closing, leasing income and merchandising fees and an equity position in the real estate;

C.      Info Disc: This involved an $85 million management buyout of a South Korean company. East West would receive an estimated $1 million profit at closing and 5% equity in the company;

D.      Olympic Village Residence and Gymnasium in Beijing ("Olympic Village"): Abramson represented that East West was involved a $654 million project to develop the Olympic Village for the Beijing Olympics. East West was to receive an estimated profit of $3.2 million at closing, residual income and equity in the real estate;

E.      Abramson claimed that East West was involved in an investment fund with assets exceeding $200 million. He also claimed that the first tranche would be closing in less than three months that East West would receive $1.8 million at closing and that it could potentially receive $5 billion in subsequent tranches over the next five years;

F.      Songdo City: Abramson represented that East West was involved in the development of Songdo City ("Songdo") in South Korea, which would be the "largest private development in the world";

G.      Abramson provided Movants with a five-year forecast of the returns Movants could expect with a $250,000 investment. The forecast projected cumulative returns of $1,143,563 by March 2005 and $3,018,629 by June 2009.

Abramson knowingly and intentionally misrepresented East West's involvement in these projects, the progress, likelihood and timing of the transactions' closing and the anticipated income that East West and its investors would receive. In reliance on Abramson's misrepresentations Movants invested substantial sums of money into East West. In a series of agreements over the next two years, Movants invested $500,000 in East West.

In or around July 2005, Movants loaned an additional $100,000 to another company partially owned by Abramson called No Good TV ("NGTV"). In order to convince Movants to make the loan, Abramson represented that an investor was unable to fulfill his obligation to loan NGTV $200,000. Abramson asked Movants to loan NGTV $100,000 and Abramson would loan the company $100,000 from his personal funds. In reliance upon Abramson's representations, Movants made a $100,000 loan to NGTV. Debtor did not make the promised loan to NGTV from his personal funds. Movants do not believe the investor referenced by Abramson existed, nor do they believe that Abramson intended to match Movants' $100,000 to NGTV.

Movants' investments functioned as loans and each agreement was accompanied with a promissory note from the company. Abramson personally guaranteed the promissory notes.

Between 2004 and 2018, Abramson made a series of factual representations to Movants made during the parties' relationship. The representations included, but were not limited to:

A)      that East West had various real estate development and financing projects worth several billion dollars, from which East West would receive hundreds of millions of dollars over the next few years;

B)      that a $100,000 investment in East West would have a return on investment of millions of dollars over the next few years;

C)      that Debtor was regularly attending overseas meetings with banks, insurers, business partners and government officials to negotiate terms and obtain project approval;

D)      that projects had in fact been approved by the relevant officials;

E)      that East West made arrangements to buy out a Hong Kong partner from the XI project;

F)      that companies were seeking to acquire or invest in East West;

G)      that a change in Chinese law prevented one or more of the projects from coming to fruition;

H)      that another investor was unable to fulfill his obligation and NGTV needed a contribution of $100,000 from Movants to cover operating expenses;

I)      that Abramson would match Movants' $100,000 loan;

J)      that East West was partnered with various international entities and organizations;

The true facts are that East West did not have some or all of the claimed real estate and financing projects in development, Abramson's representations of Movants' estimated return on investment were wildly and unjustifiably exaggerated, Abramson was using the money Movants invested in his companies for his own personal and extravagant lifestyle.

Movants never received any payments from East West or Abramson. Movants assert that Abramson's representations of fact were false and that he knew they were false when he made them. Movants were deceived by Abramson's representations and they continued to rely upon his representations as they made additional investments in East West.

A fiduciary relationship was created between Abramson and Movants when they became investors in Abramson's companies. Abramson was an officer of East West, NGTV and other companies in which he convinced Movants to invest. Abramson owed Movants a duty to act in their best interests and to provide them with accurate and complete information.

Debtor's misrepresentations and fraudulent activities continued for a number of years through 2019. In May 2020, Movants filed their Complaint with the Superior Court of California for the County of Los Angeles for Intentional Misrepresentation, False Promise, Negligent Misrepresentation, Constructive Fraud, Breach of Fiduciary Duty and Violations of Business & Professional Code §17200.

Movants were recently informed of Abramson's 2008 bankruptcy case and subsequent discharge. A review of the Court's docket shows that Abramson failed to list Movants as creditors. As a result, they were not sent the Official Form 309A notifying them of the case filing, the date and time for the §341(a) Meeting of Creditors, and most importantly, the deadline by which to file actions denying the discharge of their claims. Until recently, Movants had no idea that Abramson had been a debtor in a chapter 7 case or received a bankruptcy discharge. Movants expect Debtor to claim that any claims Movants had that predated the filing of his chapter 13 bankruptcy case or its conversion to chapter 7 have been discharged.

Movants seek to reopen Abramson's bankruptcy case for the purpose of filing an adversary action to deny the discharge of their claims against him.

-3-

**PLEASE TAKE FURTHER NOTICE** that if you wish to oppose the Motion, Local Bankruptcy Rule 9013-1(o) requires any opposition to be filed with the Clerk of the United States Bankruptcy Court, located at the Edward R. Roybal Federal Building, 255 East Temple Street, Los Angeles, CA 90012, and The Bisom Law Group, 300 Spectrum Center Drive, Suite 1575, Irvine, CA 90618, no later than fourteen (14) days before the hearing date. Any responses not timely filed and served may be deemed waived. Requests for a copy of the Motion should be in writing and directed to Andrew S. Bisom at the Bisom Law Group at the address noted above.

THE BISOM LAW GROUP

By: _____

ANDREW S. BISOM, Attorney for Movants

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
300 Spectrum Center Drive, Ste. 1575. Irvine, CA. 92618. A true and correct copy of the foregoing document entitled
(*specify*): Notice of Motion To Reopen Bankruptcy Case
will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in
the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General
Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*)
March 31, 2021, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the
following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Timothy C Aires**   tca@arlawyers.com, gperez@arlawyers.com
- **Raymond H. Aver**   ray@averlaw.com, averlawfirm@gmail.com;ani@averlaw.com;katya@averlaw.com
- **Warren L Brown - DISBARRED -**   wbbk@msn.com
- **Richard Burstein**   rburstein@brutzkusgubner.com, ecf@bg.law
- **Joseph E. Caceres**   jec@locs.com, generalbox@locs.com
- **J. Bennett Friedman**   jfriedman@flg-law.com, msobkowiak@flg-law.com;cllosa@flg-law.com
- **Daniel H Gill**   dh.gill@verizon.net
- **Steven T Gubner**   sgubner@bg.law, ecf@bg.law
- **Jeffrey A Krieger**   jkrieger@ggfirm.com,
  kwoodson@greenbergglusker.com;calendar@greenbergglusker.com;jking@greenbergglusker.com
- **Elissa Miller (TR)**   CA71@ecfcbis.com,
  MillerTrustee@Sulmeyerlaw.com;C124@ecfcbis.com;ccaldwell@sulmeyerlaw.com
- **Charles Shamash**   cs@locs.com, generalbox@locs.com
- **United States Trustee (LA)**   ustpregion16.la.ecf@usdoj.gov
- **A David Youssefyeh**   david@adylaw.com

☐

Service information continued on attached page
**2. SERVED BY UNITED STATES MAIL:**
On March 31, 2021, I served the following persons and/or entities at the last known addresses in this bankruptcy case or
adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class,
postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will
be completed no later than 24 hours after the document is filed.

Richard Abramson
9944 South Santa Monica Blvd.
Beverly Hills, CA 90212

☒  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| March 31, 2021 | Andrew Bisom | |
|---|---|---|
| Date | Printed Name | Signature |

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**

**Exhibit "B"**

1  Andrew Bisom - SBN - 137071
   BISOM LAW GROUP
2  300 Spectrum Center Drive, Ste. 1575
   Irvine, CA 92618
3  714-643-8900
   714-643-8901 (Fax)
4  abisom@bisomlaw.com

5  Attorney for Clement Serafin and
   Klementyna Newkirk
6

7              UNITED STATES BANKRUPTCY COURT

8              CENTRAL DISTRICT OF CALIFORNIA

9                  LOS ANGELES DIVISION

10

11 In re:                          )  Case No.: 2:08-bk-28573-DS
                                   )
12 **RICHARD GILBERT ABRAMSON,**   )  CHAPTER 7
                                   )
13        Debtor.                  )  **MOTION TO REOPEN BANKRUPTCY
                                   )  CASE FOR PURPOSE OF ALLOWING
14                                 )  MOVANTS TO FILE AN ADVERSARY
                                   )  ACTION TO DENY THE DISCHARGE
15                                 )  OF THEIR CLAIMS**
                                   )
16                                 )  [No Hearing Required Pursuant to Local
                                   )  Bankruptcy Rule 9013-1(o)]
17                                 )
                                   )
18 _____ )

19

20        **TO ALL PARTIES IN INTEREST AND THEIR ATTORNEYS OF RECORD:**

21        Clement Serafin and Klementyna Newkirk ("Movants") move the Court for an Order

22 reopening the bankruptcy case of Richard Gilbert Abramson ("Debtor" or "Abramson") for the

23 purpose of filing an adversary action to revoke the discharge of their claims.

24 ///

25 ///

                                  -1-

I.    **STATEMENT OF FACTS**

On November 3, 2008 Abramson filed a voluntary petition for relief pursuant to chapter 13 of title 11 of the United States Code. The case was converted to chapter 7 by order entered on April 9, 2008. Debtor's chapter 7 case was initially closed on January 3, 2013, was reopened by the Debtor on August 2, 2013 and closed again on March 16, 2016.

In or around 2004, Serafin became acquainted with Abramson pertaining to an investment in a project with East West Resort Development Corporation ("East West"). Abramson was the president and chairman of East West. Abramson represented to Movants that East West was in the business of arranging special financing for major real estate development projects throughout the world. From each transaction, East West would receive a substantial fee, residual income and equity in the projects. The projects Abramson represented to Movants that East West was involved with included but were not limited to the following:

A.    Beijing Olympic Plaza ("Olympic Plaza"): Abramson represented that the Olympic Plaza was an $850 million project with an anticipated $7.8 million in profit for East West at closing, plus $4-10 million in residual income, and 11.9% equity position in the real estate;

B.    XI Hotel in Hong Kong: Abramson represented that the XI Hotel was a $650 million project. East West would receive an anticipated $9.6 million in profit for East West at closing, leasing income and merchandising fees and an equity position in the real estate;

C.    Info Disc: This involved an $85 million management buyout of a South Korean company. East West would receive an estimated $1 million profit at closing and 5% equity in the company;

-2-

D.      Olympic Village Residence and Gymnasium in Beijing ("Olympic Village"):
Abramson represented that East West was involved a $654 million project to develop the
Olympic Village for the Beijing Olympics. East West was to receive an estimated profit of $3.2
million at closing, residual income and equity in the real estate;

E.      Abramson claimed that East West was involved in an investment fund with assets
exceeding $200 million. He also claimed that the first tranche would be closing in less than three
months that East West would receive $1.8 million at closing and that it could potentially receive
$5 billion in subsequent tranches over the next five years;

F.      Songdo City: Abramson represented that East West was involved in the
development of Songdo City ("Songdo") in South Korea, which would be the "largest private
development in the world;

G.      Abramson provided Movants with a five-year forecast of the returns Movants
could expect with a $250,000 investment. The forecast projected cumulative returns of
$1,143,563 by March 2005 and $3,018,629 by June 2009.

Abramson knowingly and intentionally misrepresented East West's involvement in these
projects, the progress, likelihood and timing of the transactions' closing and the anticipated
income that East West and its investors would receive. In reliance on Abramson's
misrepresentations Movants invested substantial sums of money into East West. In a series of
agreements over the next two years, Movants invested $500,000 in East West.

In or around July 2005, Movants loaned an additional $100,000 to another company
partially owned by Abramson called No Good TV ("NGTV"). In order to convince Movants to
make the loan, Abramson represented that an investor was unable to fulfill his obligation to loan
NGTV $200,000. Abramson asked Movants to loan NGTV $100,000 and Abramson would loan

-3-

the company $100,000 from his personal funds. In reliance upon Abramson's representations, Movants made a $100,000 loan to NGTV. Debtor did not make the promised loan to NGTV from his personal funds. Movants do not believe the investor referenced by Abramson existed, nor do they believe that Abramson intended to match Movants' $100,000 to NGTV.

Movants' investments functioned as loans and each agreement was accompanied with a promissory note from the company. Abramson personally guaranteed the promissory notes.

Between 2004 and 2018, Abramson made a series of factual representations to Movants made during the parties' relationship. The representations included, but were not limited to:

A)     that East West had various real estate development and financing projects worth several billion dollars, from which East West would receive hundreds of millions of dollars over the next few years;

B)     that a $100,000 investment in East West would have a return on investment of millions of dollars over the next few years;

C)     that Debtor was regularly attending overseas meetings with banks, insurers, business partners and government officials to negotiate terms and obtain project approval;

D)     that projects had in fact been approved by the relevant officials;

E)     that East West made arrangements to buy out a Hong Kong partner from the XI project;

F)     that companies were seeking to acquire or invest in East West;

G)     that a change in Chinese law prevented one or more of the projects from coming to fruition;

H)     that another investor was unable to fulfill his obligation and NGTV needed a contribution of $100,000 from Movants to cover operating expenses;

-4-

1         I)      that Abramson would match Movants' $100,000 loan;

2         J)      that East West was partnered with various international entities and organizations;

3        The true facts are that East West did not have some or all of the claimed real estate and

4 financing projects in development, Abramson's representations of Movants' estimated return on

5 investment were wildly and unjustifiably exaggerated, Abramson was using the money Movants

6 invested in his companies for his own personal and extravagant lifestyle.

7        Movants never received any payments from East West or Abramson. Movants assert that

8 Abramson's representations of fact were false and that he knew they were false when he made

9 them. Movants were deceived by Abramson's representations and they continued to rely upon

10 his representations as they made additional investments in East West.

11       A fiduciary relationship was created between Abramson and Movants when they became

12 investors in Abramson's companies. Abramson was an officer of East West, NGTV and other

13 companies in which he convinced Movants to invest. Abramson owed Movants a duty to act in

14 their best interests and to provide them with accurate and complete information.

15       Debtor's misrepresentations and fraudulent activities continued for a number of years

16 through 2019.  In May 2020, Movants filed their Complaint with the Superior Court of

17 California for the County of Los Angeles for Intentional Misrepresentation, False Promise,

18 Negligent Misrepresentation, Constructive Fraud, Breach of Fiduciary Duty and Violations of

19 Business & Professional Code §17200.

20       Movants were recently informed of Abramson's 2008 bankruptcy case and subsequent

21 discharge. A review of the Court's docket shows that Abramson failed to list Movants as

22 creditors. As a result, they were not sent the Official Form 309A notifying them of the case

23 filing, the date and time for the §341(a) Meeting of Creditors, and most importantly, the deadline

by which to file actions denying the discharge of their claims. Until recently, Movants had no

idea that Abramson had been a debtor in a chapter 7 case or received a bankruptcy discharge.

Movants expect Debtor to claim that any claims Movants had that predated the filing of his

chapter 13 bankruptcy case or its conversion to chapter 7 have been discharged.

Movants seek to reopen Abramson's bankruptcy case for the purpose of filing an

adversary action to deny the discharge of their claims against him.

## II.    11 U.S.C. §350 ALLOWS THE COURT TO REOPEN A CLOSED CASE

There is no time limit by which a motion to reopen can be brought under §350 or

Bankruptcy Rule 5010. Perhaps the most extreme example of the lack of a time limit may be

found in *In re Dunning Bros. Co.,* 410 B.R. 877 (E.D. CA. 2009). In *Dunning*, the Court granted

a motion to reopen a case that had been closed for 73 years to allow the trustee to administer

unscheduled property and convey clear title.

The Court held that despite the passage of more than seven decades cause existed to

reopen the case to administer the unscheduled asset. The Court did note that laches has

sometimes been a basis for not reopening a case, citing a Ninth Circuit decision under the

Bankruptcy Act, *Hull v. Powell*, 309 F.2d 3 (9th Cir. 1962), however the law in the Ninth Circuit

is that latches cannot be the basis for not opening a case under the Bankruptcy Code.

In *In re Staffer,* 306 F.3d 967 (9th Cir. 2002), the Ninth Circuit held that the question of

laches was not relevant to the question of reopening a case under the Bankruptcy Code and had

to be separately raised in subsequent substantive litigation within the reopened bankruptcy case.

*Id.* At 972-973.

In *Staffer*, a creditor appealed the Bankruptcy Court's denial of his motion to reopen

Debtor's bankruptcy case in order to file a complaint under 11 U.S.C. §523(a)(3)(B). The

-6-

1  Bankruptcy Appellate Panel reversed holding that the question of whether the

2  nondischargeability complaint was barred by laches was not properly addressed at the motion-to-

3  reopen state and should instead be determined after the case was reopened.

4      The Ninth Circuit affirmed noting:

5
            Staffer also argues that the doctrine of laches bars Predovich
6           from reopening the bankruptcy proceeding to litigate his
            nondischargeability complaint. He contends that Predovich's
7           delay of six years after becoming aware of the closed bankruptcy
            case was unreasonable, and that he would be unduly prejudiced
8           by the delay if required to litigate a §523(a)(3)(B) action at this late date.

9           Staffer appears to argue both that laches bars the preliminary
            motion to reopen, and that laches bars the underlying §523(a)(3)(B)
10          action that Predovich ultimately seeks to bring. The bankruptcy
            court collapsed the two questions into one. Under its reasoning,
11          if the underlying action is barred by laches, a motion to reopen
            should not be granted. The BAP reached a contrary conclusion, citing
12          *In re Menk*, 241 B.R. 896 (9th Cir. BAP 1999). It held that the
            question of whether Staffer could successfully assert the
13          affirmative defense of laches to Predovich's nondischargeability
            action was an extraneous issue at the motion-to-reopen state,
14          and was not properly addressed prior to the filing of the complaint.
            *Staffer*, 262 B.R. at 83 n.6. We agree with the BAP. *Id.* at 972.
15

16

17      Laches is not an issue in the present case because Movants only just learned of

18  Abramson's 2008 bankruptcy case and promptly brought their motion to seeking to reopen the

19  case and leave to file their adversary action.

20  ///

21  ///

22  ///

23  ///

24  ///

25

III.    **CONCLUSION**

Wherefore, Movants respectively request that this Court enter its order reopening their

bankruptcy case in order to file their adversary action against Abramson contesting the discharge

of their claims and for such further relief as this Court deems appropriate.

THE BISOM LAW GROUP

By: _____

ANDREW S. BISOM, Attorney for
Movants

DECLARATION OF CLEMENT SERAFIN

I, Clement Serafin am one of the movants to the instant motion. All of the following facts are within my personal knowledge and if call upon as a witness I could and would testify competently thereto.

1.    In or around 2004, I became acquainted with Richard Abramson ("Abramson") regarding investing in a project with East West Resort Development Corporation ("East West"). Abramson represented to us that he was the president and chairman of East West. Abramson further represented that East West was in the business of arranging special financing for major real estate development projects throughout the world. From each transaction, he advised us that East West would receive a substantial fee, residual income and equity in the projects. The projects Abramson told us East West was involved with included but were not limited to the following:

A.    Beijing Olympic Plaza ("Olympic Plaza"): Abramson represented that the Olympic Plaza was an $850 million project with an anticipated $7.8 million in profit for East West at closing, plus $4-10 million in residual income, and 11.9% equity position in the real estate;

B.    XI Hotel in Hong Kong: Abramson represented that the XI Hotel was a $650 million project. East West would receive an anticipated $9.6 million in profit for East West at closing, leasing income and merchandising fees and an equity position in the real estate;

C.    Info Disc: This involved an $85 million management buyout of a South Korean company. East West would receive an estimated $1 million profit at closing and 5% equity in the company;

-9-

D.     Olympic Village Residence and Gymnasium in Beijing ("Olympic Village"):

Abramson represented that East West was involved a $654 million project to develop the

Olympic Village for the Beijing Olympics. East West was to receive an estimated profit of $3.2

million at closing, residual income and equity in the real estate;

E.     Abramson claimed that East West was involved in an investment fund with assets

exceeding $200 million. He also claimed that the first tranche would be closing in less than three

months that East West would receive $1.8 million at closing and that it could potentially receive

$5 billion in subsequent tranches over the next five years;

F.     Songdo City: Abramson represented that East West was involved in the

development of Songdo City ("Songdo") in South Korea, which would be the "largest private

development in the world;

G.     Abramson provided Movants with a five-year forecast of the returns Movants

could expect with a $250,000 investment. The forecast projected cumulative returns of

$1,143,563 by March 2005 and $3,018,629 by June 2009.

2.     Abramson knowingly and intentionally misrepresented East West's involvement

in these projects, the progress, likelihood and timing of the transactions' closing and the

anticipated income that East West and its investors would receive. In reliance on Abramson's

misrepresentations, we invested substantial sums of money into East West. In a series of

agreements over the next two years, we invested $500,000 in East West.

3.     In or around July 2005, my mother and I loaned an additional $100,000 to

another company partially owned by Abramson called No Good TV ("NGTV"). In order to

convince us to make the loan, Abramson represented that an investor was unable to fulfill his

obligation to loan NGTV $200,000. Abramson asked us to loan NGTV $100,000 and stated that

-10-

stated that he would loan the company $100,000 from his personal funds. In reliance upon

Abramson's representations, we made a $100,000 loan to NGTV. Abramson never did make the

promised loan to NGTV from his personal funds. We do not believe the investor referenced by

Abramson existed, nor do we believe that Abramson intended to match our $100,000 loan to

NGTV.

4.      Our investments functioned as loans and each agreement was accompanied with a

promissory note from the company. Abramson personally guaranteed the promissory notes.

5.      Between 2004 and 2018, Abramson made a series of factual representations to us.

The representations included, but were not limited to:

A)      That East West had various real estate development and financing projects worth

several billion dollars, from which East West would receive hundreds of millions of dollars over

the next few years;

B)      that a $100,000 investment in East West would have a return on investment of

millions of dollars over the next few years;

C)      that Abramson was regularly attending overseas meetings with banks, insurers,

business partners and government officials to negotiate terms and obtain project approval;

D)      that projects had in fact been approved by the relevant officials;

E)      that East West made arrangements to buy out a Hong Kong partner from the XI

project;

F)      that companies were seeking to acquire or invest in East West;

G)      that a change in Chinese law prevented one or more of the projects from coming

to fruition;

-11-

H)    that another investor was unable to fulfill his obligation and NGTV needed a contribution of $100,000 from us to cover operating expenses;

I)    that Abramson would match our $100,000 loan;

J)    that East West was partnered with various international entities and organizations;

6.    The true facts are that East West did not have some or all of the claimed real estate and financing projects in development, Abramson's representations of our estimated return on investment was wildly and unjustifiably exaggerated, Abramson was using the money we invested in his companies for his own personal and extravagant lifestyle.

7.    We never received any payment from East West or Abramson. We now believe that Abramson's representations of fact were false and that he knew they were false when he made them. We were deceived by Abramson's representations and continued to rely upon his representations as we made additional investments in East West.

8.    Abramson stated that he was an officer of East West, NGTV and other companies in which he convinced us to invest.

9.    Abramson's misrepresentations and fraudulent activities continued for a number of years through 2019.  In May 2020, we filed our Complaint with the Superior Court of California for the County of Los Angeles alleging Intentional Misrepresentation, False Promise, Negligent Misrepresentation, Constructive Fraud, Breach of Fiduciary Duty and Violations of Business & Professional Code §17200.

10.    Only after the Superior Court case was filed were we informed of Abramson's 2008 bankruptcy case and subsequent discharge. We reviewed the Court's docket and learned that Abramson failed to list us as creditors. As a result, we were not sent the Official Form 309A notifying us of the case filing, the date and time for the §341(a) Meeting of Creditors, and most

-12-

importantly, the deadline to file actions denying the discharge of our claims. A true and correct

copy of Abramson's Schedules D and F are attached hereto as Exhibit A.

11.    Until recently, we had no idea that Abramson had been a debtor in a chapter 7

case or received a bankruptcy discharge.

12.    By this Motion we are seeking to reopen Abramson's bankruptcy case for the

purpose of filing an adversary action to deny the discharge of our claims against him.

I declare under penalty of perjury under the laws of the United States that the above

information is true and correct. Executed this _26_ day of March 2021 in _Orange County_ , CA.

_Clement Serafin_

CLEMENT SERAFIN

## DECLARATION OF ANDREW S. BISOM

I, Andrew S. Bisom  am the attorney for the Movants in this action. All of the following facts are within my personal knowledge and if call upon as a witness I could and would testify competently thereto.

1.     Attached hereto as Exhibit B is a true and correct copy of the complaint Movants intend to file should the instant motion be granted.

I declare under penalty of perjury under the laws of the United States that the above information is true and correct. Executed this 31st day of March 2021 in Irvine, CA.

_____

ANDREW S. BISOM

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT A**

B6D (Official Form 6D) (12/07)

IN RE ABRAMSON, Richard Gilbert _____    Case No. 2:08-bk-28573 EC
                                          Debtor(s)                                (If known)

## SCHEDULE D - CREDITORS HOLDING SECURED CLAIMS

State the name, mailing address, including zip code, and last four digits of any account number of all entities holding claims secured by property of the debtor as of the date of filing of the petition. The complete account number of any account the debtor has with the creditor is useful to the trustee and the creditor and may be provided if the debtor chooses to do so. List creditors holding all types of secured interests such as judgment liens, garnishments, statutory liens, mortgages, deeds of trust, and other security interests.

List creditors in alphabetical order to the extent practicable. If a minor child is the creditor, state the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian." Do not disclose the child's name. See, 11 U.S.C. §112 and Fed. R. Bankr. P. 1007(m). If all secured creditors will not fit on this page, use the continuation sheet provided.

If any entity other than a spouse in a joint case may be jointly liable on a claim, place an "X" in the column labeled "Codebtor," include the entity on the appropriate schedule of creditors, and complete Schedule H – Codebtors. If a joint petition is filed, state whether the husband, wife, both of them, or the marital community may be liable on each claim by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community."

If the claim is contingent, place an "X" in the column labeled "Contingent." If the claim is unliquidated, place an "X" in the column labeled "Unliquidated." If the claim is disputed, place an "X" in the column labeled "Disputed." (You may need to place an "X" in more than one of these three columns.)

Total the columns labeled "Amount of Claim Without Deducting Value of Collateral" and "Unsecured Portion, if Any" in the boxes labeled "Total(s)" on the last sheet of the completed schedule. Report the total from the column labeled "Amount of Claim Without Deducting Value of Collateral" also on the Summary of Schedules and, if the debtor is an individual with primarily consumer debts, report the total from the column labeled "Unsecured Portion, if Any" on the Statistical Summary of Certain Liabilities and Related Data.

☐ Check this box if debtor has no creditors holding secured claims to report on this Schedule D.

| CREDITOR'S NAME AND MAILING ADDRESS INCLUDING ZIP CODE AND ACCOUNT NUMBER. (See Instructions Above.) | CODEBTOR | HUSBAND, WIFE, JOINT, OR COMMUNITY | DATE CLAIM WAS INCURRED, NATURE OF LIEN, AND DESCRIPTION AND VALUE OF PROPERTY SUBJECT TO LIEN | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM WITHOUT DEDUCTING VALUE OF COLLATERAL | UNSECURED PORTION, IF ANY |
|---|---|---|---|---|---|---|---|---|
| ACCOUNT NO.<br><br>**Internal Revenue Service<br>P.O. Box 21126<br>Philadelphia, PA  19114** | | | **tax liens secured debt part**<br><br><br>VALUE $ | | | | 3,500.00 | 3,500.00 |
| ACCOUNT NO.<br><br> | | | <br><br>VALUE $ | | | | | |
| ACCOUNT NO.<br><br> | | | <br><br>VALUE $ | | | | | |
| ACCOUNT NO.<br><br> | | | <br><br>VALUE $ | | | | | |

_____**0** continuation sheets attached

| | Subtotal (Total of this page) | $ 3,500.00 | $ 3,500.00 |
|---|---|---|---|
| | Total (Use only on last page) | $ 3,500.00 | $ 3,500.00 |
| | | (Report also on Summary of Schedules.) | (If applicable, report also on Statistical Summary of Certain Liabilities and Related Data.) |

© 1993-2008 EZ-Filing, Inc. [1-800-998-2424] - Forms Software Only

B6F (Official Form 6F) (12/07)

IN RE ABRAMSON, Richard Gilbert

Case No. **2:08-bk-28573 EC**

Debtor(s) (If known)

## SCHEDULE F - CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS

State the name, mailing address, including zip code, and last four digits of any account number, of all entities holding unsecured claims without priority against the debtor or the property of the debtor, as of the date of filing of the petition. The complete account number of any account the debtor has with the creditor is useful to the trustee and the creditor and may be provided if the debtor chooses to do so. If a minor child is a creditor, state the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian." Do not disclose the child's name. See, 11 U.S.C. §112 and Fed. R. Bankr. P. 1007(m). Do not include claims listed in Schedules D and E. If all creditors will not fit on this page, use the continuation sheet provided.

If any entity other than a spouse in a joint case may be jointly liable on a claim, place an "X" in the column labeled "Codebtor," include the entity on the appropriate schedule of creditors, and complete Schedule H - Codebtors. If a joint petition is filed, state whether the husband, wife, both of them, or the marital community may be liable on each claim by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community."

If the claim is contingent, place an "X" in the column labeled "Contingent." If the claim is unliquidated, place an "X" in the column labeled "Unliquidated." If the claim is disputed, place an "X" in the column labeled "Disputed." (You may need to place an "X" in more than one of these three columns.)

Report the total of all claims listed on this schedule in the box labeled "Total" on the last sheet of the completed schedule. Report this total also on the Summary of Schedules and, if the debtor is an individual with primarily consumer debts, report this total also on the Statistical Summary of Certain Liabilities and Related Data.

☐ Check this box if debtor has no creditors holding unsecured nonpriority claims to report on this Schedule F.

| CREDITOR'S NAME, MAILING ADDRESS INCLUDING ZIP CODE, AND ACCOUNT NUMBER. *(See Instructions Above.)* | CODEBTOR | HUSBAND, WIFE, JOINT, OR COMMUNITY | DATE CLAIM WAS INCURRED AND CONSIDERATION FOR CLAIM. IF CLAIM IS SUBJECT TO SETOFF, SO STATE | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM |
|---|---|---|---|---|---|---|---|
| ACCOUNT NO.<br><br>**Barry E. Mallen, Esq.**<br>**11355 W. Olympic Bl**<br>**Los Angeles, CA 90064-1614** | | | notice only Counsel | | | | **0.00** |
| ACCOUNT NO.<br><br>**Gregg S. Homer, Esq.**<br>**499 N. Canon Drive**<br>**Beverly Hills, CA 90210** | | | Judgment entered August 2008 disputed business debt where debtor is currently appealing. amount claimed is $288,861.56 however debtor believes zero<br>**Subject to Setoff** | X | X | X | **unknown** |
| ACCOUNT NO.<br><br>**Gregg Homer, APC**<br>**3329 Coy Drive**<br>**Sherman Oaks, CA 91423** | | | Assignee or other notification for:<br>Gregg S. Homer, Esq. | | | | |
| ACCOUNT NO.<br><br>**Timothy Carl Aires, Esq.**<br>**180 Newport Center Drive, Ste 260**<br>**Newport Beach, CA 92660** | | | Assignee or other notification for:<br>Gregg S. Homer, Esq. | | | | |

<u>**1**</u> continuation sheets attached

|  | Subtotal<br>(Total of this page) | $ |
|---|---|---|
|  | Total<br>(Use only on last page of the completed Schedule F. Report also on the Summary of Schedules and, if applicable, on the Statistical Summary of Certain Liabilities and Related Data.) | $ |

© 1993-2008 EZ-Filing, Inc. [1-800-998-2424] - Forms Software Only

B6F (Official Form 6F) (12/07) - Cont.

IN RE ABRAMSON, Richard Gilbert
                              Debtor(s)

Case No. 2:08-bk-28573 EC
                              (If known)

## SCHEDULE F - CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS
### (Continuation Sheet)

| CREDITOR'S NAME, MAILING ADDRESS INCLUDING ZIP CODE, AND ACCOUNT NUMBER. (See Instructions Above.) | CODEBTOR | HUSBAND, WIFE, JOINT, OR COMMUNITY | DATE CLAIM WAS INCURRED AND CONSIDERATION FOR CLAIM. IF CLAIM IS SUBJECT TO SETOFF, SO STATE | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM |
|---|---|---|---|---|---|---|---|
| ACCOUNT NO. <br> **William Randolph, Esq.** <br> **355 Lexington Ave, 10th Floor** <br> **New York, NY 10017** | | | notice only Counsel | | | | 0.00 |
| ACCOUNT NO. | | | | | | | |
| ACCOUNT NO. | | | | | | | |
| ACCOUNT NO. | | | | | | | |
| ACCOUNT NO. | | | | | | | |
| ACCOUNT NO. | | | | | | | |
| ACCOUNT NO. | | | | | | | |

Sheet no. __1__ of __1__ continuation sheets attached to
Schedule of Creditors Holding Unsecured Nonpriority Claims

Subtotal
(Total of this page) $

Total
(Use only on last page of the completed Schedule F. Report also on
the Summary of Schedules, and if applicable, on the Statistical
Summary of Certain Liabilities and Related Data.) $

© 1993-2008 EZ-Filing, Inc. [1-800-998-2424] - Forms Software Only

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT B**

1  ANDREW S. BISOM (SBN 137071)
   THE BISOM LAW GROUP
2  300 Spectrum Center Drive, Ste. 1575
   Irvine, CA 92618
3  Telephone: (714) 643-8900
   Facsimile: (714) 643-8901
4  abisom@bisomlaw.com

5  Attorneys for Plaintiffs
   Clement Serafin and Klementyna Newkirk

6

7

8              **UNITED STATES BANKRUPTCY COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10                  **LOS ANGELES DIVISION**

11  **In re:**                          Case No. 2:08-bk-28573-DS

12  **RICHARD GILBERT ABRAMSON,**       Chapter 7

13                                      Adv. No.
       **Debtor**
14                                      **COMPLAINT TO DETERMINE
                                        DISCHARGABILITY OF DEBT [11 U.S.C.
15                                      §§523(a)(2)(A), (a)(2)(B), (a)(4), AND (a)(6)]**

16  ──────────────────────────

17  **CLEMENT SERAFIN,
    KLEMENTYNA NEWKIRK,**

18         **Plaintiffs,**

19  **vs.**

20  **RICHARD GILBERT ABRAMSON**

21         **Defendant.**

22
       Plaintiffs Clement Serafin ("Serafin") and Klementyna Newkirk ("Newkirk")
23

24  (collectively "Plaintiffs") make the following representations:

25                  **PRELIMINARY ALLEGATIONS**

26     1.  This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(I) and (J).

27     2.  This Court has jurisdiction to hear this matter pursuant to 28 U.S.C. §§157 and 1334,
28

                              COMPLAINT

11 U.S.C. §547.

3.  Venue is proper in this district by virtue of 28 U.S.C. §1409 because Defendant's Bankruptcy case was filed in this Court as case number 2:08-bk-28573-DS on November 3, 2008 (the "Petition Date").

4.  Plaintiffs Clement Serafin and Klementyna Newkirk are individuals and creditors in the above-referenced bankruptcy case.

5.  Plaintiffs are informed and believe and based thereon allege that Defendant Richard Abramson ("Abramson" or "Defendant") is an individual residing in the County of Los Angeles, California.

## GENERAL ALLEGATIONS

6.  On November 3, 2008 Abramson filed a voluntary petition for relief pursuant to chapter 13 of title 11 of the United States Code. The case was converted to chapter 7 by order entered on April 9, 2008. Abramson's chapter 7 case was initially closed on January 3, 2013, was reopened on August 2, 2013 and closed again on March 16, 2016.

7.  Abramson's bankruptcy schedules failed to list Plaintiffs as creditors. They were not sent the Official Form 309A notifying them of the case filing, the date and time for the §341(a) Meeting of Creditors, or the deadline by which to file actions denying the discharge of their claims. Until recently, Plaintiffs had no idea that Abramson had been a debtor in a chapter 7 case or received a bankruptcy discharge.

8.  In or around 2004, Plaintiffs became acquainted with Abramson regarding an investment in a project with East West Resort Development Corporation ("East West"). Abramson was the president and chairman of East West.

9.  At a meeting that Plaintiffs attended at Abramson's home in or about April or May 2005, Abramson conducted a slideshow presentation of East West's business activities. He

2

COMPLAINT

represented to Plaintiffs that East West was in the business of arranging special financing for major real estate development projects throughout the world. From each transaction, East West would receive a substantial fee, residual income and equity in the projects.

10.     Abramson described compensation and disbursements to the investors and officers as follows: Upon closing each transaction and after East West was reimbursed for any expenses, the company's investors were to be repaid their contribution from the proceeds on a pro rata basis until each had received their full investment.  When the investors were paid back in full, the company's officers were then to be repaid their contribution. Then the investors were to receive a bonus equaling 75% of their contribution. Then the Officers would receive their bonus. In addition, investors would be entitled to a small share of the company's profits in perpetuity.

11.     The first page of the materials provided at the presentation promised "<6 months to first closing – and investor repayment" and "Transactions will generate immediate profits, plus residual income for up to 20 years or more.  On information and belief, the first transaction was unlikely to close within six months, and Abramson had no reasonable basis to make these claims.

12.     Abramson represented to Plaintiffs that East West was involved in multiple projects, including but not limited to the following:

A.     Beijing Olympic Plaza ("Olympic Plaza"): Abramson represented that the Olympic Plaza was an $850 million project with an anticipated $7.8 million in profit for East West at closing, plus $4-10 million in residual income and 11.9% equity position in the real estate;

B.     XI Hotel in Hong Kong: Abramson represented that the XI Hotel was a $650 million project. East West would receive an anticipated $9.6 million in profit for East West at closing, leasing income and merchandising fees and an equity position in the real estate;

---

3

COMPLAINT

C.    Info Disc: This involved an $85 million management buyout of a South Korean company. East West would receive an estimated $1 million profit at closing and 5% equity in the company;

D.    Beijing Olympic Village Residence and Gymnasium ("Olympic Village"): Abramson represented that East West was involved in a $654 million project to develop the Olympic Village for the Beijing Olympics. East West was to receive an estimated profit of $3.2 million at closing, residual income and equity in the real estate;

E.    Abramson claimed that East West was involved in an investment fund with assets exceeding $200 million. He also claimed that the first tranche would be closing in less than three months, that East West would receive $1.8 million at closing and that it could potentially receive $5 billion in subsequent tranches over the next five years;

F.    Songdo City: Abramson represented that East West was involved in the development of Songdo City ("Songdo") in South Korea, which would be the "largest private development in the world;

G.    Abramson provided Plaintiffs with a five-year forecast of the returns Plaintiffs could expect with a $250,000 investment. The forecast projected cumulative returns of $1,143,563 by March 2005 and $3,018,629 by June 2009;

H.    Abramson provided a listing of East West's officers' qualifications as well as the company's business partners and cooperating organizations, which included Credit Suisse First Boston ("CSFB"), the Munich Reinsurance Group ("MARP"), Willis-Reed, VINCI Construction, the International Olympic Committee, the City of Beijing, China, and the China Sports Industry.

13.    The opportunity Abramson presented was too good for Plaintiffs to pass up. They were won over by Abramson's representations about the company and its projects and his

4

COMPLAINT

promises of massive and speedy returns on their investment.

14. Abramson knowingly and intentionally misrepresented East West's involvement in these projects, the progress, likelihood and timing of the transactions' closing and the anticipated income that East West and its investors would receive. In reliance on Abramson's misrepresentations Plaintiffs invested substantial sums of money into East West. Abramson knowingly and intentionally misrepresented East West's partnerships and cooperation with other entities, organizations, and governments. Abramson had no reasonable basis to express that these specific transactions would be closing in a matter of months and had no reasonable basis to support the estimated profits and returns on investment reported in the presentation and five-year forecast. In a series of agreements over the next two years, Plaintiffs invested $500,000 in East West.

15. Abramson knew that Plaintiffs were unsophisticated business persons and investors. Abramson's misrepresentations were made for the purpose of inducing Plaintiffs' reliance. Plaintiffs did in fact rely on Abramson's misrepresentations to their detriment by investing substantial sums of money into East West. Plaintiffs would not have invested in East West had they known the true facts and circumstances. Plaintiffs' reliance was justified due to Abramson's advanced business knowledge and experience, and their own lack of sophistication in those areas.

16. Plaintiffs embarked upon a long business relationship with multiple investments in several of Abramson's business enterprises. Unfortunately, it took Plaintiffs many years to realize that Abramson's representations were a sophisticated work of fiction designed to ensnare eager yet unsophisticated investors, continue to drain them over a period of years with false promises and friendship, and delay their discovery of the fraudulent scheme as long as possible. Debtors believe Abramson defrauded dozens of investors with this scheme.

17.   In a serious of agreements over the next two years, Plaintiffs invested a total of $500,000 in East West.

18.   In or around July 2005, Plaintiffs loaned an additional $100,000 to another company partially owned by Abramson called No Good TV ("NGTV"). In order to convince Plaintiffs to make the loan, Abramson represented that an investor was unable to fulfill his obligation to loan NGTV $200,000. Abramson asked Plaintiffs to loan NGTV $100,000 and Abramson would loan the company $100,000 from his personal funds. In reliance upon Abramson's representations, Plaintiffs made a $100,000 loan to NGTV. Abramson did not make the promised loan to NGTV from his personal funds. Movants do not believe the investor referenced by Abramson existed, nor do they believe that Abramson intended to match Plaintiffs' $100,000 to NGTV.

19.   Abramson knew these representations were false at the time he made them, and he made the representations with the intent to induce Plaintiffs' reliance.  Plaintiffs actually and justifiably relied on Abramson's misrepresentations by making an additional contribution of $100,000 into East West on or about August 8, 2005.

20.   Plaintiffs' investments functioned as loans and each agreement was accompanied with a promissory note from the company. Abramson personally guaranteed the promissory notes. The agreements provide that attorney's fees will be awarded to the successful party in litigation to interpret or enforce the agreements.

21.   Despite Abramson's promises, Plaintiffs never received payment in any amount from East West.  However, Abramson was successful in inducing Plaintiffs to continue making additional contributions to the company by regularly disseminating progress reports to the investors via email. These reports weaved tales of overseas meetings with banks, insurers, and business partners in London, Hong Kong, Beijing, Seoul, and other international cities.  The

reports contained detailed computer-generated images of the planned projects, lending further

legitimacy.

22.    According to the reports, the company was always making rapid progress in the

face of mounting red-tape and legal obstacles, and the messages were always filled with hope

and excitement for the near-future.  The project plans were perpetually awaiting final approval

by some organization or department or government official.  On numerous occasions, Abramson

reported that the projects were completely approved, and the remaining documentation was a

mere formality.  Then in subsequent reports, he would say that a new obstacle had come up or

that one of the business partners wanted to change the terms of an agreement or policy.  Profits

were always mere weeks or months away and would certainly cover all of the investors'

contributions.  Occasionally, Abramson would encourage the investors to make sure the

company had up-to-date bank account information, as if payments were imminently expected.

23.    Abramson would periodically introduce an idea for a business enterprise, which,

he claimed, would generate hundreds of millions of dollars, if not billions, for the company.  One

such product was No Surrender, which would allow individuals to borrow money backed by

their life insurance policies in larger amounts than they could receive by selling their policies or

borrowing directly from the insurer.  Abramson reported that No Surrender had a minimum

target market penetration of 1%, which equaled $2 billion in asset-backed loans per year.  He

represented that top banks and insurance companies around the world were fighting for the

opportunity to become a partner with East West in these new enterprises, none of which came to

fruition.

24.    Abramson also reported that he was in discussions with companies interested in

acquiring or investing in East West.  These alleged acquisitions never materialized.

25.    The reports Abramson provided were intentionally vague.  Abramson concealed

7

COMPLAINT

the identities of individuals and entities, and the details of their agreements, under the guise of operational security and non-existent confidentiality agreements.  On one occasion, Abramson even wrote that an investor had committed a major security breach and that he had referred the issue to his attorneys for appropriate action.  He then issued a warning to the investors not to tell anyone about the projects, even if the investor believed that that person was involved in the company.  On information and belief, these confidentiality agreements and the investor that committed the breach did not exist, and this was merely a ploy to keep the entire fraudulent scheme undetected and to keep the investors from talking to one another.

26.    Abramson was intentionally deceiving the investors, including Plaintiffs, regarding East West's involvement in the projects, as well as the progress, outlook, and profitability of the negotiations and projects.  East West may have never been involved in these projects at all, and Abramson greatly exaggerated the likelihood and timing of the transactions' closing.  Abramson intentionally deceived the investors regarding anticipated profits, and the figures he reported were grossly inflated.  Abramson misrepresented the company's expenditures and need for additional financing.  Abramson misrepresented the interest of third parties in acquiring or investing in the company.  Some or all of the company's alleged business partners did not have a relationship with East West.

27.    Abramson knew that his representations of fact were false at the time he made them.  Abramson knew that Plaintiffs were unsophisticated in business and that they would rely on his representations.  Abramson made these representations with the intent to induce Plaintiffs' reliance.  Abramson made these representations to induce the investors, including Plaintiffs, to make additional contributions and to discourage the investors from looking to deeply at the company, lest they discover the fraud.

28.    Plaintiffs were actually deceived by Abramson's representations and they

8

COMPLAINT

continued to make additional contributions to East West. With massive profits right around the corner, Abramson convinced Plaintiffs that it would be foolish to abandon the endeavor and that they should instead double down on their investment. Plaintiffs were also dissuaded from discussing the investments with other individuals and advisors.

29.    Plaintiffs were further dissuaded from discovering Abramson's fraud due to their personal relationship with him. Abramson pretended to be their friend as well as their business partner. Over the next several years, Abramson occasionally provided them tickets to sporting events, gifts and vacations.

30.    As an officer in the businesses in which Plaintiffs invested, a fiduciary relationship was created. Abramson owed Plaintiffs a duty to act in their best interests and to provide them with accurate and complete information.

31.    None of the above referenced projects were completed. For example, Abramson falsely reported that the Olympic projects failed when Chinese law was changed to require that only Chinese-domestic companies could develop such projects. With each failure Abramson would express his disappointment and then redirect investors' attention to exciting (but imaginary) new developments in the companies' other projects.

32.    In or around 2010, it became apparent to Plaintiffs that East West was not going to generate income, but Plaintiffs were still unaware that they had been victimized by Abramsons's fraud. Defendant blamed circumstances outside of his control for the company's failure. He represented to Plaintiffs that he wanted to get them their money back, and more and told them that he had a perfect new opportunity. He then induced Plaintiffs to reinvest their funds into a new venture he had started with Gene Simmons ("Simmons"), a member of the rock bank Kiss.

33.    Plaintiffs attended a party at Abramson's invitation at Simmons' home attended

9

COMPLAINT

by approximately 40-50 individuals. Abramson claimed that these people were all investors in Cool Springs Life, LLC ("Cool Springs"). Plaintiffs do not know whether the other guests had any connection with Cool Springs, but they did attend the presentation that was given during the party at Simmons' house.

34.    Abramson and others associated with Cool Springs represented to Plaintiffs that Cool Springs was in the business of arranging insurance transactions similar in design to the No Surrender product line that Abramson had pushed upon the East West investors. Cool Springs was a Tennessee limited liability company which was never registered to do business in California.

35,    Abramson did not have Plaintiffs invest directly in Cool Springs. Instead, he told Plaintiffs that in order to move their previous investments into Cool Springs, they could only do so through another one of his entities called Sunset Plaza Insurance Partners, LLC ("Sunset Plaza"), a California limited liability company registered in 2008 and suspended soon thereafter. By requiring Plaintiffs to invest in Cool Springs only in this manner, Abramson could secure their investments while keeping things "under the radar with Cool Springs." Abramson advised Plaintiffs to keep all of their communications secret and not tell Simmons that they would be investing in Sunset Plaza.

36.    Abramson told Plaintiffs of his sincere desire to protect their original investment and fulfill his long-standing promises. Plaintiffs relied upon Abramson's representations, but are now informed and believe that Abramson deceived them about his authority to enter into the reinvestment deal. On information and belief, East West and NGTV never authorized Abramson to enter into such an agreement with Plaintiffs and Cool Springs never authorized Abramson to enter into an agreement with Plaintiffs.

37.    Abramson also misrepresented Sunset Plaza's profitability while promising that

10
COMPLAINT

Plaintiffs would quickly recover their initial investment. Abramson led Plaintiffs to believe that Sunset Plaza was directly invested in Cool Springs and that it was directly involved in the marketing and sale of its Life Equity product. Abramson further represented that, by investing in Sunset Plaza, Plaintiffs would be entitled to receive a portion of Abramson's income from Cool Springs.

38.    On the contrary, Sunset Plaza was merely a shell company wholly owned by Abramson, and the company had no ownership interest in, no right to receive income from, and no direct involvement with Cool Springs. Plaintiffs' investment in Sunset Plaza did not entitle them to any income, directly or indirectly, from Cool Spring's operations. Abramson's representations regarding Cool Springs and Sunset Plaza's profitability were grossly exaggerated.

39.    Abramson knew these representations were false at the time he made them, and he made them with the intent to induce Plaintiffs' reliance. He continually spoke about his desire to protect Plaintiffs' original investment and fulfill his long-standing promises. Plaintiffs still had no reason to doubt their experienced and business-savvy friend.

40.    Plaintiffs relied on Abramson's misrepresentations to their detriment and agreed to invest in Sunset Plaza. Plaintiffs justifiably relied on Abramson's superior knowledge and expertise, and the trust they had developed in Abramson as a result of his false expressions of friendship.

41.    Plaintiffs would not have agreed to reinvest their money in Sunset Plaza had they known that they would not be entitled to any income from transactions made by Cool Springs or if they had been provided with accurate financial information for Sunset Plaza or Cool Springs. Plaintiffs also would not have entered into the agreement if they knew that Abramson lacked the authority to execute the agreement.

11

COMPLAINT

42. On or about March 30, 2010, Plaintiffs entered into a new investment agreement with Sunset Plaza. The $500,000 previously paid into East West and the $100,000 loan to NGTV, along with an additional contribution of $100,000 would be rolled into a new $700,000 investment with Sunset Plaza. Plaintiffs and the other investors would receive their principal repayment after the company was reimbursed for its expenses. After the officers received their principal repayment, the investors, including Plaintiffs, would receive an additional bonus equal to 75% of their contribution. Additionally, Plaintiffs would be entitled to 7.5% of the company's profits in perpetuity.

43. This new agreement was not accompanied by a promissory note but did include an attorneys' fees provision.

44. As with the earlier ventures, Abramson periodically disseminated reports via email to the investors describing Sunset Plaza's imaginary progress and developments, promising that transactions would soon be closing and that payments to investors would commence immediately thereafter. As each transaction failed Abramson would excitedly introduce a new one. Abramson's representations were knowingly false and were made with the intentions of stringing Plaintiffs along as long as possible so that they would not discover that they had been the victims of his decade-long con. Plaintiffs actually and justifiably relied on his representations and patiently waited for their payout.

45. Plaintiffs are informed and believe that Abramson continued to derive substantial income from his interest in Cool Springs, while continuing to represent to Plaintiffs that Cool Springs had not yet closed its first transaction and promising that revenue would start flowing soon.

46. Abramson never told Plaintiffs that Sunset Plaza's registration with the California Secretary of State was suspended shortly after Plaintiffs' investment. Abramson also never told

12
COMPLAINT

Plaintiffs that Cool Springs dissolved and ceased operations in 2014. Abramson continued to

send Plaintiffs reports on the companies' operations for years after the companies' dissolution.

47.     On or about May 10, 2015, Abramson contacted Plaintiffs via email and informed

them that another investor had backed out at the last minute and that Sunset Plaza agreed to

repay the principle amount of $50,000. Abramson requested that Plaintiffs loan Sunset Plaza an

additional $50,000. Abramson assured Plaintiffs that he would personally guarantee the loan and

would match it with his own funds.

48.     On or about May 22, 2015, Plaintiffs and Abramson executed a promissory note,

whereby Plaintiffs agreed to loan, and Sunset Plaza agreed to repay the principle amount of

$50,000. As with the other loans/investments, 75% of the contribution, or $32,500, was added to

Plaintiffs' bonus amount. This brought Plaintiffs total investment in Abramson's companies to

$750,000. Abramson signed the loan as Sunset Plaza's chairman and in his individual capacity.

49.     On information and belief, the investor alleged to have backed out of Sunset Plaza

did not actually exist. Abramson did not intend to invest $50,000 of his own funds into Sunset

Plaza nor did he invest his own funds into Sunset Plaza to match Plaintiff's contribution.

Unbeknownst to Plaintiffs, Cool Springs had already dissolved when Abramson requested the

additional funds.

50.     Abramson knew his representations were false at the time he made them.

Abramson intended for Plaintiffs to rely on his representations to invest more of their money into

his shell company.

51.     Plaintiffs justifiably relied on Abramson's misrepresentations. Plaintiffs would

not have contributed an additional $50,000 if they had known the truth of Abramson's

representations.

52.     Eventually the reports became less frequent and Plaintiffs grew tired of waiting

13
COMPLAINT

1   for their promised return on investment. In or around 2018, Plaintiffs decided to leave the

2   company, but they still did not have any reason to believe that Abramson's representations had

3   been false. In a series of emails, Plaintiff Clement sought to arrange a meeting with Abramson to

4   discuss a mutual walkaway. Abramson sought to delay the meeting for many months and

5   Clement's emails and telephone calls were not answered. When Abramson did finally respond he

6
7   would delay the meeting by claiming that he would be overseas on business.

8        53.   On or about January 10, 2019, Abramson replied to one of Clement's emails by

9   referring Clement to Abramson's attorney. It was at this point that Plaintiffs realized that

10  Abramson had defrauded them.

11
12       54.   The time it took for Plaintiffs to discover Abramson's fraudulent conduct was

13  justified and reasonable due to Abramson's superior knowledge and expertise in these matters

14  and his representations of progress, demand for silence among the investors and the position of

15  trust and confidence he held with Plaintiffs.

16       55.   Abramson misappropriated the funds that Plaintiffs had invested with him for his

17  own use and enrichment. Abramson took substantial income from the companies' operations,

18  while knowingly failing to act in the companies' and investors' best interests. Abramson

19
20  overstated the companies' expenses and treated himself to extravagant vacations while

21  purporting to engage in business activities.

22       56.   In May 2020, Plaintiffs filed their Complaint with the Superior Court of

23  California for the County of Los Angeles for Intentional Misrepresentation, False Promise,

24  Negligent Misrepresentation, Constructive Fraud, Breach of Fiduciary Duty and Violations of

25  Business & Professional Code §17200.

26       57.   Plaintiffs were recently informed of Abramson's 2008 bankruptcy case and

27  subsequent discharge. A review of the Court's docket shows that Abramson failed to list

28
                          14
                       COMPLAINT

Plaintiffs as creditors. As a result, they were not sent the Official Form 309A notifying them of the case filing, the date and time for the §341(a) Meeting of Creditors, and most importantly, the deadline by which to file actions denying the discharge of their claims. Until recently, Plaintiffs had no idea that Abramson had been a debtor in a chapter 7 case or received a bankruptcy discharge.

### FIRST CLAIM FOR RELIEF

### [Non-Dischargeability Under 11 U.S.C. §523(a)(2)((a)]

58.  Plaintiff repeats the allegations of paragraphs 1-57 with the same effect as if set forth herein.

59.  Abramson made a series of factual representations to Plaintiffs. Plaintiffs are informed and believe and thereon allege that Defendant made false representations and employed false pretenses in order to induce Plaintiffs to loan and invest funds to East West, NGTV and Sunset Plaza.

60.  Abramson knowingly and intentionally misrepresented East West's involvement in the above-referenced projects, the progress, likelihood and timing of the transactions' closing and the anticipated income that East West and its investors would receive.

61.  Defendant, for himself and his companies East West, NGTV and Sunset Plaza, obtained money by false pretenses and false representations as set forth above.

62.  Defendant made his false representations with the intent to deceive Plaintiffs.

63.  Plaintiffs reasonably relied upon Defendant's false representations to their detriment.

64.  The obligations of Defendant to Plaintiffs are not consumer debts.

65.  The debts owed by Defendant is non-dischargeable under §523(a)(2)(A) of the United States Bankruptcy Code.

## SECOND CLAIM FOR RELIEF

### [Non-Dischargeability Under 11 U.S.C. §523(a)(2)(b)]

66.     Plaintiff repeats the allegations of paragraphs 1-65 with the same effect as if set forth herein.

67.     Abramson provided Plaintiffs with a five-year forecast of the returns Plaintiffs could expect with a $250,000 investment. The forecast projected cumulative returns of $1,143,563 by March 2005 and $3,018,629 by June 2009.

68.     The information and projections included in the five-year forecast were materially false. Abramson provided Plaintiffs with the forecast with the intent to deceive Plaintiffs.

69.     Plaintiffs reasonably relied upon the five-year forecast to their detriment.

70.     The obligations of Defendant to Plaintiffs are not consumer debts.

71.     Defendant, for himself and for his companies East West, NGTV and Sunset Plaza, obtained money by using a statement in writing that was materially false respecting the financial condition of East West, NGTV and Sunset Plaza, upon which Plaintiffs reasonably relied. Plaintiffs are informed and believe and thereupon allege that Defendant made the representations contained in the writings with the intent to deceive Plaintiffs.

72.     The debts owed by Defendant is non-dischargeable under §523(a)(2)(B) of the United States Bankruptcy Code.

## THIRD CLAIM FOR RELIEF

### [Non-Dischargeability Under 11 U.S.C. §523(a)(4)]

73.     Plaintiff repeats the allegations of paragraphs 1-72 with the same effect as if set forth herein.

74.     A fiduciary relationship was created between Abramson and Plaintiffs when they became investors in Abramson's companies. Abramson was an officer of East West, NGTV,

COMPLAINT

Sunset Plaza and other companies in which he convinced Plaintiffs to invest. Plaintiffs are

shareholders and/or members of the various entities Abramson owned or controlled. Abramson

owed Plaintiffs a duty to act in their best interests and to provide them with accurate and

complete information.

75.     Defendant breached his duty of loyalty by knowingly acting against Plaintiffs'

interests by misappropriating the funds Plaintiffs invested for his personal use and enrichment.

Plaintiffs did not give their informed consent to this conduct.

76.     Defendant breached his duty of disclosure by 1) intentionally and/or negligently

misrepresenting various matters of fact which were material to Plaintiffs' decisions to invest

money in his companies; and 2) concealing material details about the progress of the projects,

negotiations, and agreements. Plaintiffs would not have made additional contributions and would

not have remained invested in the company for fourteen years had they known the true facts and

circumstances.

77.     Plaintiffs' delayed discovery of Defendant's breach was reasonable because

Defendant covered his fraudulent scheme by making continuing promises and assurances that

progress was being made, concealing critical information, providing regular encouragement,

demanding silence among the investors, and by forming a false friendship with Plaintiffs.

78.     The obligations of Defendant to Plaintiffs are not consumer debts.

79.     The debts owed by Defendant is non-dischargeable under §523(a)(4) of the

United States Bankruptcy Code.

### THIRD CLAIM FOR RELIEF

### [Non-Dischargeability Under 11 U.S.C. §523(a)(6)]

80.     Plaintiff repeats the allegations of paragraphs 1-79 with the same effect as if set

forth herein.

17

COMPLAINT

81.    Defendant has caused willful and malicious injury to Plaintiffs by wrongfully converting the money Plaintiffs loaned and invested in East West, NGTV and other companies owned or controlled by Defendant for his personal use and enrichment.

82.    The debts owed by Defendant are non-dischargeable under §523(a)(6) of the United States Bankruptcy Code.

WHEREFORE, Plaintiffs pray for entry of judgment against Defendant as follows:

1.  For a determination that the debts owed by Defendant in to Plaintiffs in the amount of $750,000 or as proven at trial, are nondischargeable under 11 U.S.C. §§523(a)(2)(A), (a)(2)(B), (a)(4) and (a)(6);

2.  For prejudgment interest;

3.  For attorneys' fees and costs;

4.  Costs of suit;

4.  For any and all other relief the Court deems appropriate.


BISOM LAW GROUP


Dated:  March 30, 2021

Andrew S. Bisom, Attorney for Plaintiffs


18

COMPLAINT

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
300 Spectrum Center Drive, Ste. 1575. Irvine, CA. 92618. A true and correct copy of the foregoing document entitled
(*specify*): Motion To Reopen Bankruptcy Case
will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in
the manner stated below:

**1.** **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General
Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*)
March 31, 2021, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the
following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below.

- **Timothy C Aires**    tca@arlawyers.com, gperez@arlawyers.com
- **Raymond H. Aver**    ray@averlaw.com, averlawfirm@gmail.com;ani@averlaw.com;katya@averlaw.com
- **Warren L Brown - DISBARRED -**    wbbk@msn.com
- **Richard Burstein**    rburstein@brutzkusgubner.com, ecf@bg.law
- **Joseph E. Caceres**    jec@locs.com, generalbox@locs.com
- **J. Bennett Friedman**    jfriedman@flg-law.com, msobkowiak@flg-law.com;cllosa@flg-law.com
- **Daniel H Gill**    dh.gill@verizon.net
- **Steven T Gubner**    sgubner@bg.law, ecf@bg.law
- **Jeffrey A Krieger**    jkrieger@ggfirm.com,
  kwoodson@greenbergglusker.com;calendar@greenbergglusker.com;jking@greenbergglusker.com
- **Elissa Miller (TR)**    CA71@ecfcbis.com,
  MillerTrustee@Sulmeyerlaw.com;C124@ecfcbis.com;ccaldwell@sulmeyerlaw.com
- **Charles Shamash**    cs@locs.com, generalbox@locs.com
- **United States Trustee (LA)**    ustpregion16.la.ecf@usdoj.gov
- **A David Youssefyeh**    david@adylaw.com

☐

Service information continued on attached page
**2.** **SERVED BY UNITED STATES MAIL:**
On March 31, 2021, I served the following persons and/or entities at the last known addresses in this bankruptcy case or
adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class,
postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will
be completed no later than 24 hours after the document is filed.

Richard Abramson
9944 South Santa Monica Blvd.
Beverly Hills, CA 90212

☒  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

March 31, 2021    Andrew Bisom

---
Date    Printed Name    Signature

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
300 Spectrum Center Drive, Ste. 1575. Irvine, CA. 92618. A true and correct copy of the foregoing document entitled
(specify): Declaration That No Party Requested A Hearing On Motion LBR 9013-1(o)(3)
will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in
the manner stated below:

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General
Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (date)
April 26, 2021, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the
following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below.


- **Timothy C Aires**   tca@arlawyers.com, gperez@arlawyers.com
- **Raymond H. Aver**   ray@averlaw.com, averlawfirm@gmail.com;ani@averlaw.com;katya@averlaw.com
- **Warren L Brown - DISBARRED -**   wbbk@msn.com
- **Richard Burstein**   rburstein@brutzkusgubner.com, ecf@bg.law
- **Joseph E. Caceres**   jec@locs.com, generalbox@locs.com
- **J. Bennett Friedman**   jfriedman@flg-law.com, msobkowiak@flg-law.com;cllosa@flg-law.com
- **Daniel H Gill**   dh.gill@verizon.net
- **Steven T Gubner**   sgubner@bg.law, ecf@bg.law
- **Jeffrey A Krieger**   jkrieger@ggfirm.com,
  kwoodson@greenbergglusker.com;calendar@greenbergglusker.com;jking@greenbergglusker.com
- **Elissa Miller (TR)**   CA71@ecfcbis.com,
  MillerTrustee@Sulmeyerlaw.com;C124@ecfcbis.com;ccaldwell@sulmeyerlaw.com
- **Charles Shamash**   cs@locs.com, generalbox@locs.com
- **United States Trustee (LA)**   ustpregion16.la.ecf@usdoj.gov
- **A David Youssefyeh**   david@adylaw.com


Service information continued on attached page  ☐

2. **SERVED BY UNITED STATES MAIL:**
On April 26, 2021, I served the following persons and/or entities at the last known addresses in this bankruptcy case or
adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class,
postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will
be completed no later than 24 hours after the document is filed.

Richard Abramson
9944 South Santa Monica Blvd.
Beverly Hills, CA 90212

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.


| April 26, 2021 | Andrew Bisom | |
|---|---|---|
| _Date_ | _Printed Name_ | _Signature_ |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**